UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------x
                             :
DOUGLAS BALDWIN             :           3:15 CV 1462 (JGM)
                             :
V.                             :
                             :
CAROLYN W. COLVIN,      :
ACTING COMMISSIONER OF  :
SOCIAL SECURITY        :
                             :           DATE: DECEMBER 1, 2016
--------------------------------------------------- x

<u>RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental

Security Income ["SSI"] benefits.

## I.  ADMINISTRATIVE PROCEEDINGS

On April 22, 2013, plaintiff filed an application for DIB and SSI benefits claiming that

he has been disabled since August 1, 2004, which date was later amended to  September

6, 2012, due to heart failure and low back pain. (Certified Transcript of Administrative

Proceedings, dated November 13, 2015 ["Tr."] 94, 247-63, 355; <u>see also</u> Tr. 110, 305, 322,

330).  Plaintiff's applications were denied initially and upon reconsideration (Tr. 137-70 ; <u>see</u>

Tr. 108-09, 130-31), and on January 6, 2014, plaintiff filed his request for a hearing before

an Administrative Law Judge ["ALJ"].  (Tr. 171-72; <u>see</u> Tr. 173-79).  A hearing was held on

April 21, 2015, before ALJ Alexander Peter Borré, at which plaintiff and vocational expert

Stephen Sachs testified.  (Tr. 37-93; <u>see</u> Tr. 193-246; <u>see also</u> Tr. 353-54).  Plaintiff has

been represented by counsel.  (Tr. 133, 135).  On May 12, 2015, ALJ Borré  issued his

decision finding that plaintiff has not been under a disability from September 6, 2012 through the date of his decision.  (Tr. 17-32).  On July 14, 2015, plaintiff filed his request for review of the hearing decision (Tr. 7; see also Tr. 8-16), and on August 26, 2015, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On October 7, 2015, plaintiff filed his complaint in this pending action.  (Dkt. #1).[1] On October 22, 2015, the parties consented to jurisdiction before this Magistrate Judge, and the case was transferred accordingly.  (Dkt. #13).  On December 8, 2015, defendant filed her answer, along with a copy of the 1,186 page administrative record.  (Dkt. #14).[2] Thereafter, on February 22, 2016, plaintiff filed his Motion to Reverse the Decision of the Commissioner, with brief in support (Dkt. #18), along with a Stipulation of Facts (Dkt. #19), and on April 22, 2016, defendant filed her Motion to Affirm, with brief in support.  (Dkt. #21).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #18) is granted such that this case is remanded consistent with this Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #21) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

At the time of his hearing, plaintiff was living with his fiancée[3] and stepson; he also

---

[1]On the same day, plaintiff filed a Motion to Proceed In Forma Pauperis (Dkt. #2), which motion was granted the next day. (Dkt. #7).

[2]There is some duplication in the administrative record.

[3]Plaintiff has been with his fiancée for "16, 17 years."  (Tr. 50).

has a teenage son who lives with the son's mother. (Tr. 48, 50).  Plaintiff was homeless for a period of time, but with the help of others, plaintiff and his family eventually moved into an apartment. (Tr. 52-53). His fiancée does the cleaning and shopping (Tr. 83-84, 315), and plaintiff cooks and washes dishes, vacuums and makes his bed.  (Tr. 314-15).   During a typical day, plaintiff does crossword puzzles and watches television.  (Tr. 316).

Plaintiff is a high school graduate. (Tr. 54).  At the time of the hearing, plaintiff was working three days a week at Denny's as a dishwasher.  (Tr. 52-55; see Tr. 289).  He works between four and five hours a shift, "because [he cannot] do much more than that without hurting."  (Tr. 52-53, 55).  According to plaintiff, his employer is "pretty good with [him] because . . . they know [his] situation," and they are "kind of working with [him]." (Tr. 53). The waitresses bring him the dishes, and at most he carries four or five plates within his small work area that he described as a "square[.]" (Tr. 66).  Plaintiff testified that he can lift "[m]aybe" five or ten pounds.  (Tr. 71).  According to plaintiff, when he lifts or carries items, he experiences shooting pain and his arm will just drop.  (Tr. 69, 72).  He cannot clean the parking lots, take out grease, or fill the ice machine, but he can clean the bathrooms, although not the toilets.  (Tr. 55).   Prior to working for Denny's, he worked as a janitor (Tr. 54; see Tr. 288), in maintenance at a car dealership, as an assembly worker, and as a cook. (Tr. 306).

According to plaintiff, he "sometimes[]" takes fifteen minute breaks and he cannot work sitting down because of his "[b]ack issues." (Tr. 56).  For the same reason, he does not drive often.  (Tr. 57). During a four hour shift, he sits down probably three times for ten or fifteen minutes at a time.  (Tr. 79).   He also testified that he can sit for "maybe five, [ten] minutes[]" (Tr. 67), can stand for ten or fifteen minutes  (Tr. 70), and can walk for ten or

3

fifteen minutes before having to stop to rest.  (Tr. 318).  He provided his employer with a doctor's note that says he should take more frequent breaks.  (Tr. 79).  Additionally, he takes frequent bathroom breaks due to his medication.  (Tr. 80).

He rates his back pain as a ten on a scale to ten, and reported that sleeping "is very hard[]" due to his back pain.  (Tr. 57; see also Tr. 60-61 (back pain is "always there"), 313 (has a "sleep disorder")).  He cannot stoop or bend because of his back. (Tr. 74-75).  He finds it "hard to really constantly stand up or walk far or climb stairs without [his] heart feeling like it's beating out [his] chest."  (Tr. 57).   Plaintiff testified that he has pain in his feet, for which he needs surgery, and it is "painful to stand[.]" (Tr. 58).  When walking, he stops and leans on something to rest.  (Tr. 67).  Sometimes he has to leave work early because after three hours, it is just "too much for" him  (Tr. 78), and he cannot stand as long as he needs to.  (Id.).  According to plaintiff, his impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, remember, understand, follow instructions, use his hands, and concentrate. (Tr. 317).

Additionally, plaintiff is seen by doctors for heart issues and he experiences dizziness which causes him to need to take breaks at work.  (Tr. 59-60; see Tr. 313 (dizzy spells, out of breath)).[4]  He also experiences dizzy spells when doing household chores. (Tr. 315).  He has a defibrillator. (Tr. 68). Plaintiff also has shortness of breath  (Tr. 60), and at times, he feels sharp pain or fluttering in his chest.  (Tr. 82; see Tr. 318).  He testified that he has a "little bit of asthma going on[]" but he stopped using an inhaler; he "didn't pursue it."  (Tr. 63).   Plaintiff smokes a pack of cigarettes every two to three days (id.), but he is bothered

---

[4]Plaintiff has been prescribed Percocet but it makes him nauseous and dizzy.  (Tr. 61).  He also reported taking Digoxin, Lisinopril, Furosemide, Spironolactone, Metoprolol, and aspirin.  (Tr. 314).

by fumes and heat, the latter of which makes him dizzy.  (Tr. 64-65).  According to plaintiff, if it gets too hot when he is working, they send him home. (Tr. 65).

The vocational expert testified at plaintiff's hearing that plaintiff's past work as a janitor was semi-skilled medium level work, as a server was light work, as a dishwasher was medium work, and as a food prep worker was light work.  (Tr. 86).  The vocational expert then testified that a person can perform the work of a server and could perform food prep work if the individual is limited to light work, but is not able to climb ladders, ropes and scaffolding, must avoid hazards such as open, moving machinery and temperature extremes, and is limited to occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling.  (Tr. 86-87).  Additionally, a person with such limitations could also perform the work of a hand packer, production worker, or production inspector.  (Tr. 87).  If such a person was limited to sedentary work, he could perform the work of a hand packager or production worker (Tr. 88), and if such a person was off task approximately fifteen percent of the workday for unscheduled breaks due to either back pain, or just to catch their breath, such a person could not work.  (Tr. 88-89).  Similarly, if such a person were absent two or more days a month, such a person could not work.  (Tr. 89).

B. MEDICAL RECORDS[5]

1. CHRONIC HEART FAILURE

Plaintiff was first diagnosed with cardiomegaly and congestive heart failure ["CHF"] in 2002-03, when plaintiff was seen at the Hospital of Central Connecticut ["HCC"](formerly known as New Britain Hospital) Emergency Department on several occasions. (See Tr. 544-58, 573, 574, 576, 596; see generally Tr. 591-95, 797).  Most of plaintiff's care has been through HCC's Emergency Department, its Medical Clinic, or its Cardiology Clinic.  On October 20, 2002, plaintiff was diagnosed with cardiomegaly. (Tr. 596).  Less than two months later, on December 8, 2002, plaintiff presented to the Emergency Department with pneumonia (Tr. 646-48; see Tr. 883-87); he was admitted and over the course of the next three days (see Tr. 649-76), he was found to have dyspnea (Tr. 655-56), acute CHF (Tr. 573, 655, 881; see Tr. 574), a severely reduced left ventricular ejection fraction ["LVEF"](Tr. 658), systolic dysfunction of major proportion (Tr. 657), systemic hypertension (id.), and morbid obesity (id.).  Three days later, he was noted again to have an enlarged heart and interval decrease in CHF. (Tr. 574, 661).  He was discharged with diagnoses of acute congestive heart failure, cardiomyopathy, upper respiratory viral syndrome, and hypertension.  (Tr. 881-82).

On February 10 and 11, 2003, plaintiff was found to have CHF, in part due to

---

[5]The following recitation is taken from the parties' comprehensive Joint Stipulation, for which the Court thanks both counsel. (Dkt. #19).

The Court has reviewed the entire administrative transcript. In addition to the records discussed in the parties' Joint Stipulation, the Court notes that plaintiff was treated for the following: eye swelling in May 2012 (Tr. 447-60, 531-32, 644-45, 735-48); for foot pain in June 2012 (Tr. 434-44, 529-30, 642-43, 720-34); for gout in his left foot in December 2012 (see Tr. 389-403, 678-91); for severe pain in both feet from skin lesions in April 2013 (Tr. 485-86, 773-74, 949-50); July 2013 (Tr. 463-65, 751-53, 928-30), and March 2014 (Tr. 1185-86); and for pain in his left foot in November 2014. (Tr. 1082-1106, 1152-60, 1166-73).  Additionally, in March and April 2003, plaintiff was diagnosed with constructive sleep apnea (Tr. 559-60, 564-65), and in August and September 2013, plaintiff underwent a polysomnogram, after which it was recommended that plaintiff be treated with a CPAP machine.  (Tr. 922-25).

medication noncompliance, dilated cardiomyopathy, morbid obesity, and hypertension. (Tr. 566, 839-40; see Tr. 567-69, 841-55). On April 29, 2003, he presented to the Emergency Department with shortness of breath. (Tr. 548).

On July 2, 2004,  he underwent a Treadmill Exercise Study (Tr. 386-87), the results of which were "[a]bnormal."  (Tr. 387).  At that time, he had a diagnosis of biventricular cardiomyopathy with severe reduction of left ventricle ["LV"] function, as well as both mitral and tricuspid regurgitation. (Tr. 386).  An echocardiogram ["ECG"] performed on July 8, 2004 revealed dilated cardiomyopathic LV with biatrial dilation. (Tr. 388).

Plaintiff was hospitalized with bronchitis, dilated cardiomyopathy, and obstructive sleep apnea ["OSA"] from January 16 to January 18, 2005. (Tr. 856-80; see Tr. 799-802). The results of an  ECG taken January 17, 2005 revealed severe dilated cardiomyopathy with severe LV dysfunction. (Tr. 868).  On October 5 and 6, 2005, plaintiff was again diagnosed with CHF, hypertension, hyperlipidemia, and OSA, with a past history of cocaine use and then current marijuana use. (Tr. 815-16; see Tr. 817-38).[6]

Plaintiff presented to the Emergency Department on February 1, 2009 (see Tr. 375-85) with chest pain; his LVEF was moderately decreased to an estimate of 30-35%, with LV cavity moderately to severely increased. (Tr. 375).

On September 6, 2012, plaintiff was admitted to HCC from the Emergency Department with chest pain (Tr. 406, 412, 624; see Tr. 403-15, 505, 508-18, 623-29, 692-703),[7] for what would be the start of more regular medical treatment for his cardiac and other conditions.  At that time, he was morbidly obese with a BMI of 38. (Tr. 514, 516, 626,

---

[6]Plaintiff was also seen for chest pain at the Outpatient Clinic in May 2007. (Tr. 805-06).

[7]Plaintiff had been in a motor vehicle accident the prior night, after which he began to feel chest pain.  (See Tr. 512, 624, 638).

7

628).  The record includes reference to an ejection fraction ["EF"] by echocardiogram in 2010 of less than 20%. (Tr. 510, 622). He was diagnosed with chronic systolic congestive heart failure, cardiomyopathy in a setting of a remote history of myocarditis, with an EF of approximately 20%, with hypertension.  (Tr. 510, 515, 622, 627).  The next day, plaintiff underwent a cardiac catheterization; his doctors concluded that he had "[s]evere cardiomyopathy[.]" (Tr. 506-07, 618-19; see Tr. 807).  An echo 2-D doppler test performed the same day revealed that the LVEF was severely decreased globally with regional disparities, the LVEF was estimated to be 25-30%, the left ventricular cavity size was severely increased, there was mild concentric left ventricular hypertrophy, and mild mitral regurgitation with mildly dilated left atrium. (Tr. 518-20, 630-32).

Plaintiff was seen in the Cardiology Clinic on September 14, 2012 (see Tr. 501-04, 613-16) for resumption of care; he reported feeling "generally well[]" and denied any chest discomfort or shortness of breath. (Tr. 501, 613).  Catherine Callan, APRN, saw him in the clinic on September 27, 2012 (see Tr. 497-500, 609-12), at which time he could walk two blocks without shortness of breath, and he denied any chest pain, palpitations, presyncope, syncope, orthopnea, night-time shortness of breath, edema, or claudication. (Tr. 497, 609). The catheterization showed LVEDP of 26, and EF less than 20%, and APRN Callan assessed nonischemic cardiomyopathy and New York Heart Association ["NYHA"] Class II heart failure. (Tr. 498, 610).  On October 15, 2012 (see Tr. 494-96, 606-08), plaintiff reported that he was feeling "very well[]" overall. (Tr. 494, 606).  His walking limit without shortness of breath was still two blocks; an examination revealed regular heart rate and rhythm, with no murmurs, rubs, gallops, or thrills, and no edema in his extremities, and APRN Callan assessed chronic systolic dysfunction and NYHA Class II heart failure. (Tr. 495, 607; see Tr. 491-93,

8

603-05).

On April 10, 2013, when seen at the Cardiology Clinic (Tr. 487-89, 597-99, 951-53), plaintiff again reported difficulties with insurance.  (Tr. 487, 597, 951).  He had run out of his medications for a time, but reported that once he resumed his medications, he regained his energy. (Id.). He had shortness of breath climbing two flights of stairs as well as tying his shoes. (Id.). On examination, his heart rate and rhythm were regular, and there were no murmurs, rubs, gallops, or thrills. (Tr. 488, 598, 952).  APRN Callan assessed nonischemic cardiomyopathy and NYHA Class II-III heart failure. (Id.).

On May 8, 2013, plaintiff reported daily episodes of dizziness, up to three times per day while working at Denny's, which had been ongoing for the past year or two, associated with a sensation described as "fluttering" in his chest. (Tr. 481-84, 769-72, 945-48).  He denied any associated symptoms. (Tr. 481, 769, 946).  APRN Callan ordered an eCardio to evaluate for significant arrhythmia. (Tr. 483, 771, 947).  An arrhythmia monitor worn from May 8 to June 17, 2013 showed abnormal eCardio with a sinus rhythm, first degree AV block, and premature ventricular contractions. (Tr. 479-80, 767-68, 944).  On June 26, 2013, plaintiff complained of palpitations when standing, and APRN Callan assessed that plaintiff had nonischemic cardiomyopathy and NYHA Class II heart failure. (Tr. 466-68, 754-56, 931-33).  When being treated for acute back pain on June 20, 2013, the doctors noted shortness of breath, both with activity and occasionally at rest, with probable cardiac etiology. (Tr. 896).

On August 8, 2013, Dr. Micha Abeles, a consultative examiner assigned by the State agency, examined plaintiff.  (Tr. 535-36).  Dr. Abeles noted the following regarding plaintiff's cardiac function: "Sounds show normal sinus rhythm. I do not appreciate gallop. No murmurs

are noted. There are no rubs." (Tr. 536).   Dr. Abeles characterized plaintiff as "a man who gives a history of cardiac disease and works up to [twelve] hours per week at this point." (Id.).   He added, "[n]o notes are available for review." (Id.).

On August 21, 2013, Nabil Habib, M.D., a State agency non-examining physician reviewing the record, found plaintiff's CHF to be non-severe (Tr. 106), and therefore did not reach the point of opining on his residual functional capacity. (Tr. 107).

An ECG on November 5, 2013 revealed an EF of 25-30% and a LVEF severely decreased globally. (Tr. 920-21).  Plaintiff returned to the Cardiology Clinic on November 18, 2013 to receive the Echo results, and APRN Callan's assessment was that the test showed no improvement of his EF of 25-30%. (Tr. 916-19).  On December 2, 2013, Angelina Jacobs, M.D., a State agency non-examining physician reviewing the record, found severe medically determinable impairments of CHF, spine disorder, obesity and essential hypertension (Tr. 124), assessed work capacity at the light level (Tr. 128) including the capacity to stand and/or walk about six hours in an eight-hour workday (Tr. 125), and concluded that plaintiff was not disabled. (Tr. 128).

On January 15, 2014, plaintiff saw cardiologist Dr. Anesh Tolot of Grove Hill Medical Center, who found him morbidly obese, with normal regular S1-S2 heart sounds and no murmurs, rubs, or gallops, and no edema in his lower extremities. (Tr. 1143-44).  Dr. Tolot assessed dilated cardiomyopathy, nonischemic, with an EF of 25-30% and NYHA Class II symptoms. (Tr. 1144). He noted severely depressed LV function despite use of optimal heart failure medications. (Id.).  Dr. Tolot suggested implantation of a single chamber left-sided implantable cardioverter-defibrillator ["ICD" or automated ICD "AICD"]. (Id.).   During plaintiff's visit to APRN Callan on March 18, 2014, he reported that he was feeling well overall

and wanted to try continuing with medication therapy prior to considering implantation of the ICD; APRN Callan continued to assess Class II heart failure and recommended the ICD. (Tr. 958-59).

Plaintiff presented to the Emergency Department on May 20, 2014 (Tr. 1054; see Tr. 1052-65) with chest pain, worse with exertion, and shortness of breath, with difficulties affording medications such that he tries to make them last longer by taking lower doses. (Tr. 1054, 1062).  He was hospitalized for two days from the Emergency Department after complaining of two weeks of worsening chest pain and palpitations at the rate of six to eight instances per day with shortness of breath and diaphoresis, radiating pain down the left arm, reproducible by exertion, especially going up the stairs or walking.  (Tr. 962-81). The records note "[h]is physical activity at this point is mainly limited to walking and little work." (Tr. 966).  He had decompensated primarily due to his inability to afford medications; once admitted, he was restarted on the least expensive generic medications available.  (Tr. 964, 968, 1062). Cardiologist Dr. Jared Insel noted that plaintiff needed long-term monitoring for arrhythmia, given the nature of his cardiomyopathy, the risk of atrial fibrillation, or the risk of malignant arrhythmias being very high; he believed that plaintiff would respond nicely to therapy. (Tr. 964).  During this visit, plaintiff reported that he had fatigue, shortness of breath, chest pain, and palpitations, but he was negative for paroxysmal nocturnal dyspnea and lower extremity edema. (Tr. 966).

A summary of findings from an Echo 2-D with Doppler on May 22, 2014 included LVEF severely decreased globally, left ventricular cavity size severely increased, LVEF estimated to be 25 to 30%, diastolic dysfunction of the left ventricle on spectral Doppler, mildly dilated left atrium, mildly enlarged right ventricle, mildly reduced RV systolic function,

mildly thickened mitral valve leaflets, and trace tricuspid regurgitation with normal pulmonary artery pressure; there was no apparent change in LV systolic function since the prior study. (Tr. 972-74; see generally Tr. 961).

Plaintiff was sent to the Emergency Department from the Cardiology Clinic on June 4, 2014 due to rapid atrial fibrillation (Tr. 988-93, 1067-81; see Tr. 994-1002, 1006-07), which he described as his heart racing, with a burning sensation, and dizziness at rest. (Tr. 1069, 1078).  He was admitted overnight.  (See Tr. 988-93).[8]

On June 2 (Tr. 984-86), June 4 (Tr. 988-90), and June 10, 2014 (Tr. 1003-05), plaintiff again reported shortness of breath and dizziness while at the Cardiology Clinic, and, as noted above, was admitted to hospital from June 4 to 5 for atrial fibrillation. (Tr. 991-92). When plaintiff returned to APRN Callan on June 10, 2014, after his hospital visit, he reported that his symptoms had significantly improved now that he was taking his medications on a daily basis; he reported only mild dyspnea. (Tr. 1003-05).  The same day, Dr. Tolot noted that plaintiff was now ready for the implant for primary prevention of sudden cardiac death. (Tr. 1145).  On June 20, 2014, Dr. Tolot implanted the AICD. (Tr. 1011-14; see also Tr. 1009, 1021-38).  Five days later, on June 25, 2014, plaintiff reported to APRN Callan that he had been doing "really well[.]" (Tr. 1041-43).  He reported that he was increasing his physical activity, his dyspnea had resolved, and he denied palpitations, chest pain, pressure, syncope, or orthopnea. (Tr. 1041).  APRN Callan assessed plaintiff as healing well from his AICD placement and "on good medical therapy[.]" (Tr. 1042).

---

[8]As discussed below, in addition to these Emergency Department visits and admissions, plaintiff was treated in the Cardiology Clinic on several occasions in 2014, including January 7 (Tr. 954-56), March 18 (Tr. 958-60), June 2 (Tr. 984-86), June 10 (Tr. 1003-05), June 25 (Tr. 1041-43), and October 7 (Tr. 1044-46), and he had two visits in consultation with a cardiologist before undergoing an AICD implant procedure. (Tr. 1143-44, 1154).

When plaintiff saw APRN Callan on October 7, 2014, he reported major financial difficulties, and he stated that overall he was feeling okay, other than feeling stressed. (Tr. 1044; see Tr. 1044-46). He reported that he experienced dizziness and shortness of breath when he overdid it, which was relieved by sitting down and resting. (Id.). Upon examination, his heart rate and rhythm were regular, and no murmurs, rubs, gallops, or thrills were appreciated. (Tr. 1045). An examination of plaintiff's extremities revealed no edema, cyanosis, or clubbing. (Id.). APRN Callan assessed nonischemic cardiomyopathy, post AICD implantation, and NYHA Class II-III symptomology, "on good medical therapy[.]" (Id.).

Most of plaintiff's care at the HCC Cardiology Clinic from September 27, 2012 through October 7, 2014, and on a monthly-to-three month frequency, was with APRN Callan, who saw him twelve times in that span, as discussed above. She completed a Cardiac Medical Source Statement, countersigned by Dr. Heather Swales, on October 24, 2014. (Tr. 1047-50). She identified a diagnosis of nonischemic cardiomyopathy NYHA II-III, afibrillation, status post AICD, obstructive sleep apnea, and hypertension, and she added back pain as a further limitation on work. (Tr. 1047, 1050). APRN Callan identified the following symptoms: weakness, arrhythmia, exertional dyspnea, exercise intolerance, chronic fatigue and dizziness. (Tr. 1048). She noted that the side effects of the medications plaintiff is taking include frequent urination, fatigue, and risk of bleeding related to Toprol XL, Furosemide and Pradaxa. (Id.). She assessed that stress and emotional factors contribute to the symptoms, but are not the primary etiology of those symptoms. (Id.). She opined that plaintiff can tolerate low stress work in that he is able to do activity with frequent rest periods and time off for medical appointments. (Id.). She explained that plaintiff has emotional difficulties in relation to the chronicity of his disease and the requirements of

medications and frequent office visits. (Id.).  She assessed that he can walk one block, stand or walk less than two hours, and sit at least six hours, and that he needs to take unscheduled breaks (the frequency of which would depend on the type of activity he was doing), lasting perhaps ten minutes, though she was not certain.  (Id.).  APRN Callan opined that with prolonged sitting, his legs should be elevated above heart level. (Tr. 1049).  If he had a sedentary job, she opined that his legs should be elevated ninety percent of an eight-hour working day, because failing to elevate his legs in this manner "can cause edema." (Id.).  She stated that he can rarely perform activities such as stooping and crouching, can rarely lift more than nine pounds, and must avoid virtually all environmental restrictions. (Id.).  She assessed that he would be off task twenty-five percent of the time, or more, due to symptoms interfering with attention and concentration, and that he would be absent about four days per month if he was trying to work full time. (Tr. 1050).

### 2.DEGENERATIVE DISC DISEASE

On May 23 (Tr.  808-12, 891-95), June 20 (Tr. 813, 896), August 22 (Tr. 814, 897), and November 18, 2013 (Tr. 898), plaintiff was seen at either the HCC Emergency Department or the HCC Medical Clinic for chronic back pain. On May 23, an examination revealed mild reduction in range of motion of the lumbar spine, no spinal tenderness, and positive straight leg raising ["SLR"] test at 45° bilaterally. (Tr. 810, 893). Motor, sensory, and reflex examinations were normal. (Id.).  On June 20, he reported being unable to get up independently after bending down at work, and examination findings were remarkable for spinal tenderness and limited range of motion due to pain. (Tr.  813, 896).  An x-ray on June 20, 2013  revealed moderate L5-S1 spondylosis (Tr. 469-70, 757-58, 934-35), and a lumbar MRI on July 10, 2013 revealed chronic degenerative disc disease, with significant neural

foraminal narrowing bilaterally at L5-S1. (Tr. 461-62, 749-50, 926-27).

On August 8, 2013, consultative examiner Dr. Abeles observed that plaintiff could flex his back to forty degrees, and could extend to twenty degrees; he complained of back pain during the examination. (Tr. 536; see Tr. 535-36).  Reflexes were equal and symmetrical and gait and tandem gait were normal. (Id.).   On August 22, 2013, plaintiff complained of increasing back pain, weakness in his legs, left leg tingling, and the inability to sit still or walk for long, also indicating that his lack of insurance prevented more frequent visits to the doctors. (Tr. 897). The assessment was of chronic back pain, worsening at that time. (Id.)

Plaintiff was seen in consultation by a neurosurgeon, Dr. Hussein I. Alahmadi, on November 15, 2013.  (Tr. 1183-84).  Dr. Alahmadi recorded a chronic history of low back pain, radiating to the left leg. (Tr. 1183).  Plaintiff sat with moderate discomfort; a motor examination revealed no atrophy and normal muscle tone, with the exception of left dorsiflexor weakness; he had decreased sensation in the left leg, decreased reflexes, decreased range of motion, positive SLR on the left, and an antalgic gait. (Tr. 1183-84). Based on his examination of plaintiff's July 2013 MRI, Dr. Alahmadi found advanced L5-S1 disc degeneration with bilateral foraminal stenosis. (Tr. 1184). He recommended an L5-S1 epidural injection, and he concluded that plaintiff was a poor candidate for surgery given his morbid obesity, active smoking, and advanced CHF. (Id.).

During a November 18, 2013 clinic visit, plaintiff reported that he planned to follow up for lumbar injections; he reported that he had some pain, but had been able to continue working on light duty. (Tr. 898).

As noted above, on December 2, 2013, State agency physician Dr. Jacobs reviewed the record as it existed on that date, noted plaintiff's spine disorder, and assessed work

capacity at the light level of exertion. (Tr. 124-28).  Plaintiff's lumbar pain and radiculopathy had been treated with epidural injections on a number of occasions. (See Tr. 915 (December 4, 2013), 957 (March 13, 2014)).  Plaintiff endured some physical therapy in the summer and fall of 2014 (Tr. 1107-34), and when seen on November 10, 2014 in the Medical Clinic, plaintiff reported ongoing back pain; he sought an injection as he had received in the past, which he reported had worked very well for him. (Tr. 1151).

### 3. OBESITY

Virtually every note or record mentions obesity or morbid obesity, beginning with an entry on December 10, 2002 when plaintiff was seen at HCC for his cardiac condition. (Tr. 654; see Tr. 652-55).  His Body Mass Index has been rated as follows: March 2, 2003, BMI of 45 (Tr. 564); June 28, 2012, BMI of 38 (Tr. 433); September 26, 2013, BMI of 43 (Tr. 922); November 19, 2014, BMI of 43.5 (Tr. 1165); and January 14, 2015, BMI of 47 (Tr. 1174).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would

accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson

v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106,

111 (2d Cir. 1998)(citation omitted).   However, the court may not decide facts, reweigh

evidence, or substitute its judgment for that of the Commissioner.   See Dotson v. Shalala,

1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the

entire record to determine the reasonableness of the ALJ's factual findings.   See id.

Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence

and should be upheld even in those cases where the reviewing court might have found

otherwise.   See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d

Cir. 1997)(citation omitted).

## IV.  DISCUSSION

Following the five-step evaluation process,[9] ALJ Borré found that plaintiff has not

engaged in substantial gainful activity since September 6, 2012, the amended alleged onset

date.  (Tr. 22, citing 20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).   ALJ Borré then

_____

[9]Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. §§ 404.1520 and 416.920(a).  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.150(a)(4)(iii) and 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

concluded that plaintiff has the following severe impairments: cardiomyopathy, chronic heart failure, degenerative disc disease, and obesity  (Tr. 23, <u>citing</u> 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 23, <u>citing</u> 20 C.F.R. §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  At step four, "[a]fter careful consideration of the entire record," ALJ Borré found that plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except that: he can never climb ladders, ropes, or scaffolds; he must avoid hazards such as open moving machinery and unprotected heights; he can occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; and he must avoid temperature extremes.  (Tr. 23-30).  The ALJ decided that plaintiff is unable to perform any of his past relevant work as a janitor, server, dishwasher, or in food prep.  (Tr. 30, <u>citing</u> 20 C.F.R. §§ 404.1565 and 416.965).  The ALJ then concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, and based on the testimony of the vocational expert, plaintiff is capable of performing the work of a hand packer, production worker, and production inspector, all of which is sedentary work.  (Tr. 31, <u>citing</u> 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).  Accordingly, the ALJ held that plaintiff has not been under a disability from September 6, 2012 through the date of his decision.  (Tr. 31, <u>citing</u> 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ failed to assign proper weight to the medical opinions of record (Dkt. #18, Brief at 2-16); the ALJ erred in determining that plaintiff's allegations were less than credible, and the credibility assessment ultimately rendered the RFC inaccurate and incomplete (<u>id.</u> at 16-

19); the RFC for sedentary work is not supported by substantial evidence as the ALJ failed to include all impairments and limitations in his determination of residual functional capacity, resulting in an RFC that is not supported by the record and that failed to satisfy the Commissioner's burden at Step Five of the determination.  (Id. at 19-24).

Defendant asserts that the ALJ did not err in reviewing the medical opinions, and substantial evidence supports the RFC finding (Dkt. #21, Brief at 5-21); substantial evidence supports the ALJ's credibility finding (id. at 21-24); and substantial evidence supports the ALJ's Step Five finding.  (Id. at 24).

A. ALJ'S TREATMENT OF THE OPINIONS OF RECORD

In this case, the ALJ assigned "partial weight" to the opinion of plaintiff's "treating cardiac specialist[,]" APRN Callan (Tr. 30), and in doing so, found her opinion "inconsistent with the longitudinal treatment record and with the record as a whole[,]" particularly with regard to her requirement that plaintiff "elevate his legs" when his physical examinations were "consistently negative for lower extremity edema[.]" (Id.). Plaintiff contends that the ALJ erred in assigning partial weight to this opinion, when a treating specialist's opinion is entitled to controlling weight under the treating physician rule.  (Dkt. #18, Brief at 12-15).

"'The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008), quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted)).  Generally, "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by the medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013), citing Burgess, 537 F.3d at 128 (opinion of

19

treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record)(additional citations omitted)); see also 20 C.F.R. § 404.1527(c)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight."); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted).   Under the treating physician rule, an ALJ assigns weight to a treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(c)(2)(formerly 20 C.F.R. § 404.1527(d)(2)).  "In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider" the foregoing factors. Selian, 708 F.3d at 418.    Additionally, "[a]fter considering the above factors, the ALJ must 'comprehensively set forth his [or her] reasons for the weight assigned to a treating physician's opinion.'" Burgess, 537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2)(stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion[]"(emphasis added)).

Only "acceptable medical sources"[10] may establish the existence of a medically determinable impairment, see 20 C.F.R. § 416.913(a), can give medical opinions, see 20 C.F.R. § 416.927(a)(2), and can be considered treating sources whose opinions are entitled to controlling weight.  See 20 C.F.R. § 416.927(c).  An APRN is not an acceptable medical source, Social Security Regulation ["SSR"] 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006), but rather, is considered an "other source[,]" as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d).  An "other source" may be used to show the severity of the individual's impairments and how the individual's ability to function is affected.  20 C.F.R. §§ 404.1513(d) and 416.913(d).   Under the Regulations, such opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 232939, at *3.  Accordingly, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning[.]"  Id. at *6.

The Commissioner now argues that "[i]ndeed, '[t]he fact that a medical opinion is from 'an acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' are the most qualified health care professionals." (Dkt. #21, Brief at 18, quoting SSR 06-03p (additional internal quotations omitted)). However, in his decision, the ALJ did not address the weight that would have been assigned to Callan's opinion because she was an APRN, see 20 C.F.R. § 404.1513(a), nor did the ALJ

---

[10]The term "acceptable medical source" includes: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; or (5) qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

address the import of Dr. Swales' co-signature, <u>Godin v. Astrue</u>, No. 11 CV 881 (SRU), 2013 WL 1246791, at *3 (D. Conn. Mar. 27, 2013)("ignoring the co-signature of a physician is significant because the opinion of even a non[-]examining physician is entitled to consideration in accordance with the guidelines for evaluating all medical opinions")(internal quotations & citations omitted), nor did he determine the appropriate weight to assign to such opinion under the treating physician rule. <u>See Johnson v. Colvin</u>, No. 14 CV 1446 (MPS), 2016 WL 659664, at *3 (D. Conn. Feb. 28, 2016)("It is not clear whether the ALJ evaluated [the opinion of the APRN, co-signed by an MD] under the treating physician rule."); <u>Payne v. Astrue</u>, No. 10 CV 1565 (JCH), 2011 WL 2471288, at *5 (D. Conn. Jun. 21, 2011)(when the physician assistant's opinion is co-signed by a physician, ALJ "should have explained whether or not he considered these opinions to be the opinions of an appropriate medical source, and if not, then why[]").  In the absence of such a discussion, the Court cannot determine whether the ALJ properly considered the co-signed opinion, and assigned the appropriate weight thereto. <u>Compare Perez v. Colvin</u>, No. 13 CV 868 (HBF), 2014 WL 4852836, at *26 (D. Conn. Apr. 17, 2014), <u>approved and adopted</u>, 2014 WL 4852848 (D. Conn. Sept. 29, 2014)("Where, as here, an [APRN's] opinion is cosigned by a [physician], but there are no records or other evidence to show that the [physician] treated [the claimant], the APRN's opinion does not constitute the opinion of the physician."); <u>Petrie v. Astrue</u>, 412 F. App'x 401, 405 (2d Cir. 2011)(ALJ did not err in refusing to find physicians' opinions controlling, due to the physicians' "limited and remote contact" with the claimant), <u>with</u> <u>Godin</u>, 2013 WL 1246791, at *3 (internal quotations & citations omitted)(remand when there is "no apparent indication that [the] opinion was not independently considered and endorsed by the co-signing physician[]")(citation omitted).

The record reflects that plaintiff has received regular treatment from APRN Callan since September 2012 (see Tr. 497-500, 609-12), coinciding with his amended onset date of disability. (See Tr. 355).  Rather than discussing the weight to assign this opinion, either as an "other source" with consideration of the longstanding treatment relationship, Godin, at *3-4, or as a "treating physician" opinion which is entitled to deference, see Johnson, 2016 WL 659664, at *3, the ALJ generally stated that the "opinion is inconsistent with the longitudinal treatment record and with the record as a whole." (Tr. 30).[11]  In turn, the ALJ "accorded great weight" to the non-examining State agency consultants' opinions.

When a treating source opinion is not given controlling weight, an ALJ must "explain in the decision the weight given to the opinions of a State agency" consultant. 20 C.F.R. § 416.927(e)(2)(ii).  In this case, the ALJ stated: "The opinions of the State agency consultants are accorded great weight as they are supported by explanation and citation to the medical record and are consistent with the record as a whole[.] Medical evidence received at the hearing level does not support a finding of greater functional impairment."  (Tr. 30).

In her brief, the Commissioner appropriately recited that in weighing opinions, "such as Dr. Jacobs, an ALJ uses the same relevant factors set forth in 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d)," but then goes on to claim that the "ALJ discussed substantial evidence that supported and was consistent with Dr. Jacobs's assessment, including evidence both pre and post-dating Dr. Jacobs's opinion."  (Dkt. #21, Brief at 7).  The ALJ, however, did not cite to specifics of Dr. Jacobs's opinion, and in fact did not even refer to Dr. Jacobs by name, but rather, generally stated that the "opinions of the State agency consultants are accorded great

---

[11]Plaintiff contends that the ALJ did not specify any variance between APRN Callan's opinion and her underlying treatment records and plaintiff's activities of daily living and his ability to work part time. (Dkt. #18, Brief at 7, 9-12).

weight as they are supported by explanation and citation to the medical record and are consistent with the record as a whole[.]" (Tr. 30).   In support of this statement, however, the ALJ cited the Medical Source Statement of <u>only one</u> State agency consultant, Dr. Jacobs. (<u>Id.</u>).   The only opinions in the record as to plaintiff's work capacity and functional limitations were those issued by Dr. Jacobs and by plaintiff's treating APRN, Catherine Callan.   Dr. Jacobs's opinion was rendered in December 2013, prior to plaintiff's treatment with Dr. Tolot and the implantation of the AICD, and prior to many visits to the Emergency Department and Cardiac Clinic.   As of December 2013, Dr. Jacobs concluded that plaintiff has a light level work capacity (Tr. 128), and that he is able to stand and/or walk about six hours in an eight-hour workday (Tr. 125).   The ALJ "accorded great weight" to this sole opinion of a State agency consultant, and in doing so, added that the "[m]edical evidence received at the hearing level does not support a finding of greater functional impairment."  (Tr. 30). However, the ALJ's ultimate RFC assessment reflects exactly that –  a finding of greater functional impairment – as the ALJ concluded that plaintiff is limited to sedentary, not light, work.  Presumably the ALJ relied on hearing level medical evidence to reach that conclusion, yet his decision does not provide the reviewing court with a confirmation of that presumption.  Although the Commissioner asserts that the ALJ applied the factors set forth in 20 C.F.R. §§ 404,1527(a)-(d) and 416.927(a)-(d), and that the "ALJ discussed substantial evidence that supported and was consistent with Dr. Jacobs's assessment, including evidence both pre and post-dating Dr. Jacobs's opinion[,]" (Dkt. #21, Brief at 7), the ALJ's discussion of the opinions of record is, as referenced above, generalized and incomplete.

The situation in this case is similar to that which was addressed by Chief Judge Christina Reiss in the District of Vermont:

Here, the ALJ concluded that [the treating physician's] opinion was "not supported by clinical observations or other evidence of record," but she did not specify what evidence she relied on to reach that conclusion.  The only support for this conclusion is the ALJ's reference to [an] Exhibit . . ., the . . . "Medical Source Statement of Ability to do Work-Related Activities (Mental and    Physical)."  . . .  [T]he ALJ's evaluation of [the treating physician's] opinions consists of one generalized sentence. Because this generalized sentence does not provide "good reasons" for rejecting [the treating physician's] opinion, it cannot be affirmed on review.  Nor can the court accept the Commissioner's invitation to search the records for evidence which may supply "good reasons."

Mott v. Astrue, No. 10 CV 165, 2011 WL 4748345, at *5 (D. Vt. Oct. 6, 2011)(citations and footnote omitted).  Moreover, the Second Circuit has made clear that "[a] reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'" Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999), quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  This reviewing court cannot accept this rationale fashioned by counsel at this stage in the case, "[n]or can the court accept the Commissioner's invitation to search the record for evidence which may supply 'good reasons[]'" for the weight assigned to the opinions of record.  Mott, 2011 WL 478345, at *5, citing Snell, 177 F.3d at 134.  The only support articulated by the ALJ in his decision is his citation to "(Exhibit 6A)" which, according to the Court Transcript Index, is Dr. Jacobs's Medical Source Statement. (Tr. 30).

Accordingly, upon remand, the ALJ shall consider "whether . . . [the co-signed] opinion[] [is that] of an acceptable medical source[,]" and "explicitly consider the treating physician factors so that [the ALJ] may comprehensively set forth [his] reasons for deciding whether to give the opinion[] controlling weight[,]" Johnson, 2016 WL 659664, at *3-4, and if the ALJ does not assign controlling weight to the opinion of the treating provider, explain the weight given to the opinions of the State agency consultant by considering the relevant

25

factors set forth in the Regulations.   20 C.F.R. §§ 404.1527 and 416.927.   The ALJ's treatment of these opinions of record is particularly important because the only opinions in the record as to plaintiff's work capacity and functional limitations were those issued by Dr. Jacobs and by APRN Callan.  The ALJ, therefore, must also reconsider plaintiff's RFC in light of his treatment of APRN Callan's opinion.[12]

### B. REMAINING ARGUMENTS

For the reasons explained above, plaintiff's remaining arguments will, by necessity, be addressed by the ALJ on remand.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse the Decision (Dkt. #18) is granted such that this case is remanded consistent with this Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #21) is denied.

Dated at New Haven, Connecticut, this 1st day of December, 2016.


     /s/ Joan G. Margolis USMJ
     Joan Glazer Margolis
     United States Magistrate Judge

---

[12]Plaintiff contends that the ALJ erred in diminishing APRN Callan's opinions regarding edema, and the ALJ erred in failing to include that limitation in his RFC and in the hypothetical questions posed to the vocational expert. (Dkt. #18, Brief, at 7-8).  The ALJ concluded that plaintiff is limited to sedentary work, which work requires long periods of sitting, with occasional standing and walking. See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  Consistent with this Ruling, on remand, the ALJ shall consider the import of plaintiff's medical records, as well as the treating providers' opinions on plaintiff's ability to sit for long periods, as would be required for sedentary work.